Anthony **SEWELL,**

v.

**MARYLAND DEPARTMENT OF TRANSPORTATION, Mass Transit Administration.**

**No. Civ. WMN–01–2590.**

United States District Court, D. Maryland.

April 29, 2002.

Mark R. Millstein, Millstein Law Offices, Baltimore, MD, for plaintiff.

J. Joseph Curran, III, Adelberg Rudow Dorf and Hendler LLC, Kathleen J. Masterton, Office of the Attorney General, Irwin M. Brown, Callista Marie Freedman, Mass Transit Administration, Baltimore, MD, for defendants.

## MEMORANDUM AND ORDER

BREDAR, United States Magistrate Judge.

This action has been referred to the undersigned for disposition of all discovery disputes. Pending and ready for disposition is defendant's motion for protective order (Paper No. 26).[1] No hearing is necessary. Lo-

---

1. Defendant incorporated in its reply a motion for sanctions. (Paper No. 30). The time for a response to that motion has not run and it will be addressed at a later date.

cal Rule 105.6. For the reasons set forth below, the motion is hereby GRANTED.

### I. Background

Anthony Sewell is an employee of the Mass Transit Administration (MTA). He brought this case, alleging workplace race discrimination, in the Circuit Court for Baltimore County, and the MTA removed it to this Court. (Paper No. 1).

It appears that Mr. Sewell plans to offer expert testimony at trial regarding emotional damage suffered as a result of the alleged discriminatory conduct. Accordingly, as part of discovery, Mr. Sewell was subjected to a psychiatric evaluation on February 25, 2002, by a medical expert retained by the MTA, Dr. John Lion. Immediately following the evaluation,[2] Dr. Lion apparently spoke to counsel for the MTA, to one of Mr. Sewell's health care providers and to the MTA police regarding his concern that Mr. Sewell posed a danger in the workplace. Shortly thereafter,[3] Dr. Lion wrote a letter to counsel for the MTA in which he stated that Mr. Sewell had "indicated" during the examination that he had thought of killing his supervisor; that he had brought a revolver to work in his duffle bag; and that he had a cache of weapons at home including long guns, handguns and grenades.[4] (Paper No. 26, Exhib. 6). The MTA forthwith suspended Mr. Sewell from service and, on February 26, 2002, counsel for the MTA, Asst. Atty. Gen. Callista M. Freedman, faxed a letter to Mr. Sewell's attorney, Mark R. Millstein, in which she reported having been told by Dr. Lion that Mr. Sewell claimed to have brought guns and grenades onto MTA property and that Mr. Sewell planned on killing his supervisor,[5] Ms. Freedman voiced concern over security arrangements for upcoming depositions and suggested that Mr. Millstein call her. (Paper No. 28, Attachment).

Mr. Millstein states in his opposition (Paper No. 28) that upon learning of these events he attempted to reach Dr. Lion by telephone and, failing in that attempt, wrote and faxed to Dr. Lion a letter dated February 27, 2002. In that letter Mr. Millstein wrote that Dr. Lion's statements to Ms. Freedman had resulted in Mr. Sewell being discharged from employment, that Mr. Sewell denied Dr. Lion's description of his statements during the evaluation, that it was apparent to Mr. Millstein that his client had a cause of action for defamation, and that he expected a response to the letter within seven business days. (Paper No. 28, Attachment).

On March 12, 2002, Dr. Lion wrote to Ms. Freedman that he was discontinuing his services to the MTA as an expert witness in the case and that there existed a possibility that he might become a fact witness. (Paper No. 26, Exhib. 3).

In a certification attached to the motion for protective order, Ms. Freedman reports that she spoke with Mr. Millstein on February 27, 2002, regarding his attempts to have *ex parte* contacts with defendant's expert, Dr. Lion having called her to inform her that Mr. Millstein kept leaving messages for Dr. Lion to call him. She reports having told Mr. Millstein that the only time Mr. Millstein could talk to Dr. Lion about the evaluation was at a deposition. She also reports that she later discovered that Mr. Millstein had an *ex parte* telephone conversation with Dr. Lion during which the evaluation and the expert report were discussed. Ms. Freedman further states that several days later she asked Mr. Millstein why he had contacted Dr. Lion against her wishes and that Mr. Millstein "replied that he could do what he wanted." (Paper No. 26, Exhib. 1). She also states that on March 8, 2002, she received a

---

2. Such an evaluation is sometimes referred to as an "independent medical examination" or I.M.E.

3. The letter written by Dr. Lion indicates that it was written the day after the evaluation of Mr. Sewell, but it is dated two days after the evaluation.

4. The propriety of Dr. Lion's conduct and the scope of his duty in these circumstances is not

germane to the issue under consideration and while the Court in no way suggests Dr. Lion's conduct was inappropriate, it will not be addressed here.

5. The details in Ms. Freedman's letter to Mr. Millstein are somewhat at odds with those in Dr. Lion's letter to Ms. Freedman.

telephone call from Dr. Lion in which he "indicated" that Mr. Millstein's threats of litigation against him were preventing him from viewing the matter in a clear-headed manner and that he needed to turn his attention toward defending himself against a defamation suit. *Id.*

Also of record is a letter from Ms. Freedman to Mr. Millstein dated March 8, 2002, in which she stated that during a telephone conversation between them on February 27, 2002, Mr. Millstein had become irate, abusive and loud. She wrote that he had falsely accused her of manufacturing the workplace violence issue and engineering the termination of Mr. Sewell from employment in order to get the upper hand in the litigation. Finally, she alleged that he had threatened to file an ethics violation and a lawsuit against her. She, in turn, charged that Mr. Millstein had interfered with MTA's defense and had breached the Maryland State Bar Association's Code of Civility and the Maryland Rules of Professional Conduct. (Paper No. 26, Exhib. 4).

In requesting a protective order, the MTA seeks to bar plaintiff's counsel from any further *ex parte* contact with Dr. Lion or any other expert retained by the defense in this action.

## II. Analysis

The conduct of plaintiff's counsel in regard to Dr. Lion has been totally inappropriate. As noted by the Ninth Circuit in *Erickson v. Newmar Corp.*, 87 F.3d 298, 302 (9th Cir. 1996), there is little case law on the issue of *ex parte* contacts with an opponent's expert, "possibly because the violation seldom happens ..." *id.*, or, put another way, the vast majority of attorneys are sufficiently cognizant of their professional responsibility to avoid such an error. The Court calls Mr. Millstein's attention to Formal Opinion 93–378 of the ABA Committee on Ethics and Professional Responsibility entitled *"Ex Parte Contacts with Expert Witnesses,"* wherein the committee notes that such conduct in a federal case violates Fed.R.Civ.P. 26(b)(4) and in any case (federal or otherwise) it implicates Model Rule 3.4(c) of the Model Rules of Professional Conduct. Rule 26(b)(4) sets out specific and exclusive procedures for obtaining the opinions (and bases therefor) of experts who may testify for the opposing party. Mr. Millstein was entitled to serve written interrogatories concerning Dr. Lion's opinions, and he could have taken Dr. Lion's deposition. But no matter how offensive he found Dr. Lion's conduct, he was not permitted to grab the telephone, ring up the expert, and try to interrogate him about his opinions, the medical examination, or anything else bearing upon Dr. Lion's involvement in the case. Mr. Millstein was not allowed to send Dr. Lion an accustatory/interrogative letter, and he certainly was not allowed to demand a response from the expert "no later than seven business days from today." (Paper No. 26, Exhib. 2). If Mr. Millstein believed that Dr. Lion had misbehaved or that as plaintiff's counsel he was entitled to learn more about what happened at the medical examination, his options were to raise the matter with opposing counsel and, if unsatisfied after that dialogue, he could seek a deposition or raise the matter with the Court.

The Court is further troubled by Ms. Freedman's averment that Mr. Millstein asserted that "he could do whatever he wanted" in respect to communicating with Dr. Lion. Surprised that it seems to need to do so, the Court hastens to set that matter straight. None of us—judges or lawyers—is free to disregard the Rules of Procedure when we are agitated by events occurring during litigation.

Mr. Millstein's communication with Dr. Lion violated Rule 26(b)(4) of the Federal Rules of Civil Procedure. On this occasion the care and circumspection that should mark the conduct of a lawyer practicing in this Court was lacking. The Court expects that Mr. Millstein will strictly adhere to the Rules of Procedure and Professional Conduct in his future work before this Court.

The request for a protective order is GRANTED. Mr. Millstein shall have no contact or communication with the defendant's experts in this case except as allowed in the Federal Rules.